1  Gary J. Smith (SB #141393)
2  Ryan R. Tacorda (SB #227070)
   BEVERIDGE & DIAMOND, P.C.
3  456 Montgomery Street, Suite 1800
   San Francisco, CA 94104-1251
4  Telephone: (415) 262-4000
   Facsimile: (415) 262-4040
5
6  Robert Brager
   BEVERIDGE & DIAMOND, P.C.
7  201 North Charles Street, Suite 2210
   Baltimore, MD 21201-4150
8  Telephone: (410) 230-3850
   Facsimile: (410) 230-3868
9
   Attorneys for Defendant
10 PPG INDUSTRIES, INC.

11               UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13
   CALIFORNIA WATER SERVICE
14 COMPANY,                                    CASE NO.  **3267**

15            Plaintiff,                        DECLARATION OF GARY J. SMITH IN
                                                SUPPORT OF NOTICE OF REMOVAL OF
16     vs.                                      ACTION UNDER 28 U.S.C. § 1441(b)
                                                (ORIGINAL JURISDICTION)
17 THE DOW CHEMICAL COMPANY; E.I.
   DUPONT DE NEMOURS AND COMPANY;
18 PPG INDUSTRIES, INC.; VULCAN
   MATERIALS COMPANY; OCCIDENTAL
19 CHEMICAL CORPORATION; VALERO
   ENERGY CORPORATION; STAUFFER
20 CHEMICAL COMPANY; BOWE-PERMAC,
   INC., individually and d/b/a BOWE TEXTILE
21 CLEANING, INC.; HOYT CORPORATION;
   R.R. STREET & CO., INC.; MCGRAW
22 EDISON COMPANY, individually and d/b/a
   AMERICAN LAUNDRY MACHINERY, INC.,
23 AMERICAN LAUNDRY MACHINERY, INC.,
   individually and d/b/a AJAX
24 MANUFACTURING DIVISION AND
   MARTIN EQUIPMENT, WHITE
25 CONSOLIDATED INDUSTRIES, INC.,
   individually and d/b/a WASHEX
26 MACHINERY DIVISION, ELECTROLUX
   CORPORATION, LINDUS S.R.L., individually
27 and d/b/a LINDUS WEST, COLUMBIA
   DRYCLEANING MACHINES, a/k/a

28                                    -1-

ORIGINAL FILED
JUL - 7 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
E-filing

1  COLUMBIA/ILSA MACHINES CORP.,
   REALSTAR, INC., individually and d/b/a
2  REALSTAR USA, UNION DRYCLEANING
   PRODUCTS USA, FIRBIMATIC,
3  BERGPARMA OF AMERICA, LLC, AMA
   UNIVERSAL, FLUORMATIC MIDWEST
4  LTD., FORENTA LP, WESTERN MULTITEX
   CORP., MARVEL MANUFACTURING,
5  RENZACCI OF AMERICA, SAIL STAR USA,
   VIC MANUFACTURING CORPORATION,
6  M.B.L., INC., GOSS-JEWETT CO. OF
   NORTHERN CALIFORNIA, MCGREGOR
7  SUPPLY COMPANY, S.B. SUPPLY INC.,
   WASHEX MACHINERY OF CALIFORNIA,
8  INC., WORKROOM SUPPLY, INC., TAYLOR
   HOUSEMAN, INC., UNITED FABRICARE
9  SUPPLY, INC., ECHCO SALES INC., MW
   EQUIPMENT, ARTHUR KAJIWARA
10 EQUIPMENT CO., INC., KELLEHER
   EQUIPMENT SUPPLY, INC., US
11 MACHINERY & ENGINEERING CO., INC.,
   WYATT-BENNETT, CORBETT
12 EQUIPMENT, FULLER SUPPLY
   COMPANY, SAV-ON MACHINERY
13 COMPANY, INC. and DOES 1 through 750,
   INCLUSIVE,
14
                        Defendants.
15

16

17        I, Gary J. Smith, declare:

18        1.      I am an attorney licensed to practice law before the courts in the State of California.  I

19 am a Principal at the law firm of Beveridge & Diamond, P.C., which represents defendant PPG

20 Industries, Inc. in the above referenced action.

21        2.      The following facts are within my personal knowledge and, if called to testify to the

22 matters stated herein, I could and would competently do so.

23        3.      Attached as Exhibit A is a true and correct copy of the Amended Complaint in

24 *Department of Toxic Substances Control v. City of Chico*, Case No. Civ. S-02-0442 LKK DAD

25 (E.D. Cal. filed Dec. 3, 2002) (referred to as the "DTSC CERCLA Litigation").

26        4.      Attached as Exhibit B is a true and correct copy of the Settlement Agreement and

27 Consent Decree Between Department of Toxic Substances Control and Plaintiff in the DTSC

28                                              -2-
   _____
       DECLARATION OF GARY J. SMITH IN SUPPORT OF NOTICE OF REMOVAL OF ACTION
          UNDER 28 U.S.C. § 1441(b) (ORIGINAL JURISDICTION)

1    CERCLA Litigation which was approved by the United States District Court for the Eastern District

2    of California on May 23, 2007.

3        5.    Attached as Exhibit C is a true and correct copy of the letter I received from Richard

4    T. Petrillo on June 27, 2008, on behalf of defendant Mondial Drycleaning Products, Inc. (improperly

5    named Union Drycleaning Products U.S.A. in Plaintiff's Complaint) which consents to the Notice of

6    Removal in the above-referenced case.

7        6.    In order to request that defendant Stauffer Chemical Company ("Stauffer") join or

8    consent to the Notice of Removal in the above-referenced action, I attempted to contact Stauffer and

9    its counsel.  On information and belief, Stauffer no longer exists.  This is supported by the California

10   Business Portal on the California Secretary of State website, which shows Stauffer surrendered its

11   right to transact business in California in 1987.

12       7.    In order to request that defendant Firbimatic join or consent to the Notice of

13   Removal, I contacted Tito Mazzetta, local counsel for Firbimatic.  On June 27, 2008, Mr. Mazzetta

14   informed me that Firbimatic had not been served in the above-referenced action.  On June 27, 2008,

15   Mr. Mazzetta also informed me that defendant RealStar Inc. d/b/a RealStar USA ("RealStar"), which

16   he also represents, had not been served in the above-referenced action.  In addition, Richard T.

17   Petrillo, authorized to act on Firbimatic and RealStar's behalves, consented to removal for both

18   Firbimatic and RealStar if served.  Attached as Exhibits D and E are true and correct copies of the

19   letters I received on June 30, 2008 from Mr. Petrillo providing such consent for Firbimatic and

20   RealStar, respectively.

21       8.    Attached as Exhibit F is a true and correct copy of the letter I received from Probal G.

22   Young on behalf of defendant Echco Sales Co., Inc. ("Echco") which consents to the Notice of

23   Removal in the above-referenced case in the event Echco is properly served.

24

25

26

27

28

DECLARATION OF GARY J. SMITH IN SUPPORT OF NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441(b) (ORIGINAL JURISDICTION)

1      I declare under the penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3      Executed this _____7_____ day of July 2008 in San Francisco, California.

4

5                            By: _____

                                   Gary J. Smith

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GARY J. SMITH IN SUPPORT OF NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441(b) (ORIGINAL JURISDICTION)

# EXHIBIT A

1  BILL LOCKYER
      Attorney General of the State of California
2  THEODORA BERGER
      Senior Assistant Attorney General
3  SUSAN S. FIERING (S.B. # 121621)
   TIMOTHY E. SULLIVAN (S.B. # 197054)
4     Deputy Attorneys General
   1515 Clay Street, 20th Floor
5  P.O. Box 70550
   Oakland, CA 94612-0550
6  Telephone: (510) 622-2100
   Fax: (510) 622-2270
7

8  Attorneys for Plaintiff
   CALIFORNIA DEPARTMENT OF TOXIC
9  SUBSTANCES CONTROL



10

11              UNITED STATES DISTRICT COURT

12          FOR THE EASTERN DISTRICT OF CALIFORNIA

13

14  CALIFORNIA DEPARTMENT OF TOXIC          Case No. CIV.S-02-0442 LKK DAD
    SUBSTANCES CONTROL,
15
                           Plaintiff,        AMENDED COMPLAINT FOR
16                                           RECOVERY OF RESPONSE
             v.                              COSTS; DECLARATORY
17                                           RELIEF; INJUNCTIVE RELIEF;
    CITY OF CHICO, CALIFORNIA, a California  ENFORCEMENT OF
18  municipality; NORET, INC., a California corporation;  ADMINISTRATIVE ORDER; AND
    GOLDIE OLSON, an individual; PEDEN       TREBLE DAMAGES
    ENTERPRISES, a California corporation; JOHN
19  PEDEN, an individual; LORENA PEDEN, an
    individual; SUNSET VIEW CEMETERY
20  ASSOCIATION, INC., a California corporation;
    NORVILLE R. WEISS, an individual; JANET L.
21  WEISS, an individual; and CALIFORNIA WATER
    SERVICE COMPANY, a California Corporation,
22
                           Defendants.
23

24

25

26       Plaintiff, the California Department of Toxic Substances Control ("DTSC" or the

27  "Department"), alleges as follows:

28

                                    1.

JURISDICTION

1.     This Court has jurisdiction over DTSC's federal law claims, which arise under Chapter 103 of Title 42 U.S.C., pursuant to 28 U.S.C. section 1331 and 42 U.S.C. section 9613(b).

2.     This Court has jurisdiction over DTSC's state law claims under the supplemental jurisdiction provision of 28 U.S.C. section 1367(a) and under 28 U.S.C. section 2201, in that the state and federal claims arise from common facts relating to release of hazardous substances and remediation of or failure to remediate the resulting contamination, as hereinafter more fully appears.

VENUE

3.     Venue is proper in this District pursuant to 28 U.S.C. section 1391(b) and 42 U.S.C. section 9613(b) because the release or threatened release of hazardous substances occurred in this District, and the nuisance is located in this District.

STATEMENT OF THE ACTION

4.     Pursuant to section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. section 9601 et seq., DTSC seeks to recover from defendants jointly and severally all costs incurred in response to certain releases and/or threatened releases of hazardous substances, including, but not limited to, perchloroethylene in the soil and groundwater underneath the central business district of the City of Chico, California (the "Site").

5.     Pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), DTSC also seeks a declaratory judgment that defendants are jointly and severally liable for all additional costs incurred by DTSC in response to releases and/or threatened releases of hazardous substances at the Site.

6.     Pursuant to California Health and Safety Code section 58009, DTSC seeks injunctive relief to abate a public nuisance consisting of contamination at the Site.

7.     Pursuant to California Health and Safety Code section 25358.3, DTSC seeks injunctive relief to abate an imminent or substantial endangerment to public health and safety or

2.

1    to the environment.

2        8.    Pursuant to California Health and Safety Code section 25358.3, DTSC seeks to

3    enforce administrative orders issued to various defendants for investigation and remediation of

4    the Site.

5        9.    Pursuant to California Health and Safety Code section 25359, DTSC seeks

6    damages equal to three times the amount of certain costs incurred by DTSC as a result of the

7    failure of certain defendants to properly provide a removal or remedial action.

8                                    PLAINTIFF

9        10.    DTSC is an agency of the State of California, organized and existing pursuant to

10   California Health and Safety Code section 58000 et seq. As used in this complaint, "DTSC" or

11   "Department" encompasses both the existing agency, DTSC, and its predecessor agency, the

12   Toxic Substances Control Program of the California Department of Health Services. Under

13   California law, DTSC is the State agency responsible for responding to a release or threatened

14   release of hazardous substances into the environment and for determining whether such release

15   or threatened release has occurred or may occur. It has authority under California Health and

16   Safety Code section 58009 to abate public nuisances and authority under California Health and

17   Safety Code section 25358.3 to abate any imminent or substantial endangerment to public health

18   and safety or to the environment.

19                                   DEFENDANTS

20       11.    CITY OF CHICO, CALIFORNIA, a California municipal government, owned

21   and/or operated the municipal sanitary and storm sewer system throughout the central downtown

22   business district of Chico. Hazardous substances were released from this sewer system into the

23   environment during the City's period of ownership and/or operation of the sewer system.

24       12.    NORET, INC. is a California corporation which owned and/or operated Esplanade

25   Dry Cleaners at 164 East 2nd Avenue, in Chico, California. There were releases of hazardous

26   substances from this location during Noret's period of ownership and/or operation.

27       13.    GOLDIE OLSON is an individual who, along with her late husband Gerald

28   Olson, owned and/or operated Flair Cleaners at 660 Mangrove Ave. in Chico, California. There

                                        3.

1   were releases of hazardous substances from this location during Ms. Olson's period of ownership
2   and/or operation.

3      14.   PEDEN ENTERPRISES, a California Corporation, is an entity which owned
4   and/or operated Flair Cleaners at 660 Mangrove Ave. in Chico, California. There were releases
5   of hazardous substances from this location during Peden Enterprises' period of ownership and/or
6   operation.

7      15.   JOHN PEDEN is an individual who owned and/or operated Flair Cleaners at 660
8   Mangrove Ave. in Chico, California. There were releases of hazardous substances from this
9   location during Mr. Peden's period of ownership and/or operation.

10     16.   LORENA PEDEN is an individual who owned and/or operated Flair Cleaners at
11  660 Mangrove Ave. in Chico, California. There were releases of hazardous substances from this
12  location during Ms. Peden's period of ownership and/or operation.

13     17.   SUNSET VIEW CEMETERY ASSOCIATION, INC., a California corporation, is
14  an entity which currently holds title to a parcel located at 660 Mangrove Ave. in Chico,
15  California, the location of Flair Cleaners. There have been releases of hazardous substances
16  from this location during Sunset View Cemetery Association's period of ownership.

17     18.   NORVILLE R. WEISS is an individual who owned and/or operated Esplanade
18  Cleaners at 164 East 2nd Avenue in Chico, California. There were releases of hazardous
19  substances from this location during Mr. Weiss's period of ownership and/or operation.

20     19.   JANET L. WEISS is an individual who owned and/or operated Esplanade
21  Cleaners at 164 East 2nd Avenue in Chico, California. There were releases of hazardous
22  substances from this location during Ms. Weiss's period of ownership and/or operation.

23     20.   CALIFORNIA WATER SERVICE COMPANY, a California corporation, is an
24  entity that owned and/or operated and continues to own and/or operate public water supply wells
25  at various locations in and around the Site. Hazardous substances were present in the wells and
26  were released from the wells into the environment.

27                          GENERAL ALLEGATIONS

28     21.   The Site consists of various facilities within the central business district of the

4.

1    City of Chico, California which are using or historically have used perchloroethylene. The Site

2    includes the dry cleaning facilities themselves, the soil around these facilities where hazardous

3    substances have come to be located, the sewer pipes through which these dry cleaners released

4    hazardous substances, the soil around such sewer facilities where released hazardous substances

5    have come to be located, public water supply wells that contained water contaminated with

6    hazardous substances and that released hazardous substances to surrounding groundwater, and a

7    single, intermingled and indivisible plume of hazardous substance contamination in the

8    groundwater beneath these facilities and throughout the central business district of Chico, and to

9    which each of the facilities is contributing. The drinking water of the City of Chico has been and

10   is continuing to be impacted by this plume of contamination.

11        22.     Various facilities within the geographic area of the Site have used, and may be

12   continuing to use, perchloroethylene and/or other hazardous substances in a manner resulting in

13   releases to the soil and/or groundwater at the Site. At this time, the facilities which DTSC

14   believes have caused releases to the soil and/or groundwater include the Flair Custom Cleaners

15   facility at 660 Mangrove Avenue and the Esplanade Cleaners facility at 164 East 2nd Avenue.

16   There may be other facilities in the area of the Site from which releases have occurred, and which

17   are contributing to the single, intermingled and indivisible plume of perchloroethylene

18   contamination in the groundwater underneath the central business district of Chico, and DTSC

19   may amend this complaint to add additional responsible parties if and when such facilities are

20   identified.

21        23.     Releases from the facilities may have occurred through a variety of mechanisms,

22   including but not limited to direct releases onto the ground at the facilities and releases into

23   sewer connections at the facilities. Perchloroethylene that entered the sewer pipes connecting

24   various facilities to the City of Chico municipal sewer system was released from such pipes into

25   the surrounding soil and/or groundwater. The City of Chico owned and/or operated these sewer

26   lines from which there were releases into the environment.

27        24.     Public waters supply wells owned and/or operated by the California Water

28   Service Company, including but not limited to wells known as CWS-2, CWS-10, and CWS-21,

5.

1  contained water contaminated with hazardous substances and released hazardous substances to

2  surrounding groundwater.

3        25.    Contamination at the Site was first detected in 1984 during sampling of municipal

4  water wells in Chico. Beginning in 1986, DTSC began to investigate or oversee the investigation

5  of the nature and extent of contamination from these facilities, and that investigation continues to

6  the present time.

7        26.    DTSC has incurred costs in response to the releases or threatened releases at the

8  Site for which DTSC has not been reimbursed. DTSC will continue to incur response costs until

9  the remedy, and operation and maintenance of the remedy, is completed.

10       27.    As part of its response and enforcement activities, DTSC has also incurred legal

11  fees and costs in an amount yet to be determined.

12       28.    Based on the releases and threatened releases of hazardous substances from the

13  Site to soil and groundwater, as described in paragraphs 21 to 24, above, the Department has

14  determined pursuant to California Health & Safety Code section 25358.3 that there may be an

15  imminent or substantial endangerment to the public health or welfare or to the environment

16  because of these releases and threatened releases and further has determined that removal or

17  remedial action is necessary.

18       29.    On May 17, 1990, the Department issued an Imminent or Substantial

19  Endangerment and Remedial Action Order to Peden Enterprises, Gerald Olson and the Sunset

20  View Cemetery Association. The order requires the respondents to take action to investigate and

21  remediate the contamination released from the facility at 660 Mangrove Avenue in Chico. At

22  various times within the previous five years, Peden Enterprises and the Sunset View Cemetery

23  Association have failed to comply with this order.

24       30.    On June 21, 1990, the Department issued an Imminent or Substantial

25  Endangerment and Remedial Action Order to Noret, Inc. and to Mary Reed, who was then the

26  owner of the property at 164 East 2nd Avenue. The order requires the respondents to take action

27  to investigate and remediate the contamination released from the facility at 164 East 2nd Avenue

28  in Chico. At various times within the previous five years, Noret, Inc. has failed to comply with

6.

1   this order.

2       31.   The Department notified Gerald Olson and defendants City of Chico, Noret, Inc.,

3   Peden Enterprises, John Peden, Lorena Peden, Sunset View Cemetery Association, Inc., Norville

4   R. Weiss, Janet L. Weiss, and California Water Service Company that they are legally

5   responsible for the costs incurred in responding to the release and threatened release of hazardous

6   substances from the Site.  None of the defendants have paid for these costs.

### FIRST CLAIM FOR RELIEF

(Claim for Response Costs Against All Defendants Pursuant to
section 107(a) of CERCLA, 42 U.S.C. section 9607(a))

10       32.   DTSC incorporates the allegations set forth in the preceding paragraphs as if fully

11   set forth herein.

12       33.   Each of the dry cleaning locations identified herein, the sewer pipes connected to

13   those locations, and each of the public water supply wells that was contaminated with hazardous

14   substances and released hazardous substances into the surrounding groundwater, including but

15   not limited to wells known as CWS-2, CWS-10, and CWS-21, is a "facility" as defined in section

16   101(9) of CERCLA, 42 U.S.C. section 9601(9).

17       34.   Each defendant is a "person" as defined in section 101(21) of CERCLA, 42

18   U.S.C. section 9601(21).

19       35.   Perchloroethylene is a "hazardous substance" as defined in section 101(14) of

20   CERCLA, 42 U.S.C. section 9601(14).

21       36.   The presence of hazardous substances, including, but not limited to,

22   perchloroethylene, in the soil and groundwater at the Site constitutes a release or threatened

23   release of hazardous substances into the environment within the meaning of section 101(22) of

24   CERCLA, 42 U.S.C. section 9601(22).

25       37.   As a result of releases and/or threatened releases of hazardous substances into the

26   environment, DTSC has incurred "response costs" as defined in sections 107(a) and 101(25) of

27   CERCLA, 42 U.S.C. sections 9607(a) and 9601(25).

28       38.   DTSC's response costs were and are being incurred in a manner not inconsistent

7.

1  with the National Contingency Plan, 40 C.F.R., part 300.

2      39.    DTSC is a "State" for purposes of section 107(a)(4) of CERCLA, 42 U.S.C.

3  section 9607(a)(4).

4      40.    Each defendant owned and/or operated a facility from which there were releases

5  of hazardous substances within the meaning of section 107(a)(1)-(2) of CERCLA, 42 U.S.C.

6  section 9607(a)(1)-(2).

7      41.    As owners and operators of facilities, defendants jointly and severally are liable

8  without regard to fault under section 107(a) of CERCLA, 42 U.S.C. section 9607(a) for costs

9  DTSC has incurred in response to the releases or threatened releases of hazardous substances into

10  the environment, in an amount in excess of $5,000,000.

11                          SECOND CLAIM FOR RELIEF

12          (Declaratory Relief Against All Defendants Pursuant to section
13              113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2))

14      42.    DTSC incorporates the allegations set forth in the preceding paragraphs as if fully

15  set forth herein.

16      43.    DTSC continues to incur response costs as a result of the releases or threatened

17  releases of hazardous substances into the environment at the Site.

18      44.    Pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2), DTSC

19  is entitled to a declaratory judgment that defendants jointly and severally are liable for all

20  additional costs DTSC incurs in response to releases or threatened releases of hazardous

21  substances into the environment at the Site.

22                          THIRD CLAIM FOR RELIEF

23          (Injunctive Relief Against All Defendants for Abatement of Public
24          Nuisance Pursuant to California Health & Safety Code section 58009)

25      45.    Plaintiff incorporates the allegations in the preceding paragraphs as though fully

26  set forth herein.

27      46.    The presence of hazardous substances, including, but not limited to,

28  perchloroethylene, in the soil and groundwater at the Site constitutes a public nuisance within the

8.

1    meaning of sections 3479 and 3480 of the California Civil Code.

2        47.    The presence of hazardous substances, including, but not limited to,

3    perchloroethylene, in the soil and groundwater at the Site is a matter within the Department's

4    jurisdiction and constitutes a condition that is dangerous to the public health, within the meaning

5    of section 58009 of the California Health and Safety Code.

6        48.    The threat to the public health and safety posed by the nuisance at the Site will

7    continue unless defendants are ordered to abate and do abate the nuisance.

8                            FOURTH CLAIM FOR RELIEF

9                (Claim for Injunctive Relief Against All Defendants Pursuant to
10                       Health and Safety Code section 25358.3)

11       49.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully

12   set forth herein.

13       50.    Health and Safety Code section 25358.3(a) provides that:

14           (a)    Whenever the director determines that there may be an imminent or
        substantial endangerment to the public health or welfare or to the environment,
15      because of a release or a threatened release of a hazardous substance, the director
        may do any or all of the following:

16           (1)    Order any responsible party or parties to take or pay for
17      appropriate remedial or remedial action necessary to protect the public
        health and safety and the environment . . . .

18
                            . . .
19
             (3)    Request the Attorney General to secure such relief as may be
20      necessary from the responsible party or parties to abate the danger or
        threat . . . .

21       51.    Health and Safety Code section 25358.3(e) provides that:

22           (e)    Whenever there is a release or threatened release of a hazardous substance,
23      the director may request the Attorney General to secure such relief as may be
        necessary from the responsible party or parties to abate the release or threatened
24      release. . . . Upon a showing by the department that a release or threatened release
        of a hazardous substance has occurred or is occurring, and that there may be an
25      imminent or substantial endangerment to the public health and safety or to the
        environment, the court may grant a temporary restraining order or a preliminary
26      or permanent injunction.

27       52.    The director of the Department of Toxic Substances Control has determined that

28   the contamination in the soil and groundwater at the Site presents an imminent or substantial

                                    9.

1  endangerment to the environment and to the public health or welfare.  In accordance with Health

2  & Safety Code section 25358.3, the Department of Toxic Substances Control has requested that

3  the Attorney General secure relief in this case to abate the danger or threat to the public health

4  and safety and to the environment.

5          53.     Plaintiff is entitled to a preliminary and permanent injunction requiring

6  defendants to take actions necessary to respond to the release and threatened release of hazardous

7  substances from the Site.

### FIFTH CLAIM FOR RELIEF

8

9          (Claim for Injunctive Relief Against Peden Enterprises and the
           Sunset View Cemetery Association for failure to comply with
10         Imminent or Substantial Endangerment and Remedial Action
           Orders issued Pursuant to California Health and Safety Code
11                          section 25358.3)

12         54.     Plaintiff incorporates the allegations of the preceding paragraphs as though fully

13  set forth herein.

14         55.     Pursuant to Health and Safety Code sections 25358.3 and 25355.5, the

15  Department issued an Imminent or Substantial Endangerment and Remedial Action Order on

16  May 17, 1990 requiring Peden Enterprises and the Sunset View Cemetery Association to take

17  actions to respond to the contamination at the Site.

18         56.     The above-named defendants have refused to comply with the terms of the order

19  on which they were named as responsible parties.

20         57.     Health and Safety Code section 25358.3(f) provides that:

21         (f)     Upon the failure of any person to comply with any order issued by the
           department pursuant to this section or Section 25355.5, the director may request
22         the Attorney General to petition the superior court for the issuance of an
           injunction requiring that person to comply with the order.  The superior court
23         shall have the jurisdiction to grant a temporary restraining order or a preliminary
           or permanent injunction.

24

25         58.     Plaintiff is entitled to an order requiring each of the above-named defendants to

26  comply with the requirements of the order naming them as responsible parties.

27

28

10.

## SIXTH CLAIM FOR RELIEF

(Claim Under California Health and Safety Code section 25359 for
Treble Damages Against Peden Enterprises, the Sunset View
Cemetery Association, and Noret, Inc. for failure to provide removal
or remedial action upon order of the Department)

59.    Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

60.    At various times within the previous five years, Peden Enterprises and the Sunset View Cemetery Association failed, without sufficient cause, to provide a removal or remedial action as ordered by the Department in the May 17, 1990 Imminent or Substantial Endangerment and Remedial Action Order issued to them.

61.    At various times within the previous five years, Noret, Inc. failed, without sufficient cause, to provide a removal or remedial action as ordered by the Department in the June 21, 1990 Imminent or Substantial Endangerment and Remedial Action Order issued to it.

62.    Each of the Imminent or Substantial Endangerment and Remedial Action Orders issued to the above-named defendants advised them that, under California Health and Safety Code section 25359, failure to comply with the Order could subject them to liability for three times the governmental costs incurred.

63.    As a result of the failure by Peden Enterprises, the Sunset View Cemetery Association, and Noret, Inc. to take proper action as ordered by the Department, the Department has incurred costs, including costs to the state account as described in California Health and Safety Code section 25359.  Peden Enterprises, the Sunset View Cemetery Association, and Noret, Inc. are liable to the Department for three times the amount of costs to the state account.

## PRAYER FOR RELIEF

WHEREFORE, DTSC prays for judgment against defendants as follows:

1.    For a judgment that defendants jointly and severally are liable to DTSC without regard to fault for response costs incurred by DTSC as a result of the releases or threatened releases of hazardous substances at the Site in an amount in excess of $5,000,000;

2.    For a judgment that certain defendants are liable to DTSC for appropriate

11.

1    prejudgment interest thereon;

2         3.    For a declaration that defendants are liable to DTSC without regard to fault for all

3    future costs incurred by DTSC in response to releases or threatened releases of hazardous

4    substances at the Site;

5         4.    For injunctive relief requiring defendants to take all action necessary to abate the

6    nuisance caused by contamination of soil and/or groundwater at the Site;

7         5.    For injunctive relief requiring the abatement of an imminent or substantial

8    endangerment at the Site;

9         6.    For injunctive relief requiring compliance with the Department's imminent or

10   substantial endangerment orders by those defendants which are not currently in compliance with

11   orders issued to them;

12        7.    For damages equal to three times the amount of costs incurred by the state account

13   as a result of the failure of specified defendants to provide a removal or response action as

14   ordered by the Department;

15        8.    For the costs of this lawsuit;

16        9.    For costs of enforcement, including attorney's fees; and

17        10.   For such other relief as the Court deems just and proper.

18

19   DATED: *December 2, 2002*

20                                        BILL LOCKYER, Attorney General
                                             of the State of California
21                                        THEODORA BERGER
                                          Senior Assistant Attorney General
22                                        SUSAN S. FIERING
                                          Deputy Attorney General
23

24                                   By   _____
                                          TIMOTHY E. SULLIVAN
25                                        Deputy Attorney General

26                                        Attorneys for Plaintiff
                                          CALIFORNIA DEPARTMENT OF TOXIC
27                                        SUBSTANCES CONTROL

28

                                        12.

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: *California Dept. of Toxic Substances Control v. Chico City, et al.*
No.: **CIV.S-02-442 LKK DAD**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On December 2, 2002, I served the attached **AMENDED COMPLAINT FOR RECOVERY OF RESPONSE COSTS; DECLARATORY RELIEF; INJUNCTIVE RELIEF; ENFORCEMENT OF ADMINISTRATIVE ORDER; AND TREBLE DAMAGES** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1515 Clay Street, Suite 2000, Oakland, California 94612-1413, addressed as follows:

K. Greg Peterson, Esq.
400 Capitol Mall, 11th Floor
Sacramento, CA 95814
*Attorney for Peden Enterprises, John Peden, and Lorena Peden*

Phillip M. Jelley, Esq.
Britt Habegger, Esq.
Fitzgerald, Abbott & Beardsley LLP
1221 Broadway, 21st Floor
Oakland, CA 94612
*Attorney for Sunset View Cemetery Association, Inc.*

Goldie Olson
567 E. Lassen Ave., Unit 523
Chico, CA 95973-0660

Phillip C. Hunsucker, Esq.
Brian L. Zagon, Esq.
David A. Rabbino, Esq.
Resolution Law Group
3687 Mt. Diablo Blvd., Suite 330
Lafayette, CA 94549
*Attorney for Noret, Inc., Norville Weiss, and Janet Weiss*

Francis Malcolm Goldsberry II, Esq.
Francis Malcolm Goldsberry II, Esq.
Goldsberry Freeman et al., LLP
777 12th St #250
Sacramento, CA 95814
*Attorney for City of Chico*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 2, 2002, at Oakland, California.

_____
TANISHA MARSHALL
Declarant

*Tanisha Marshall*
_____
Signature

EXHIBIT B

1  BILL LOCKYER
   Attorney General of the State of California
2  TOM GREENE
   Chief Assistant Attorney General
3  THEODORA BERGER
   Senior Assistant Attorney General
4  KEN ALEX
   Supervising Deputy Attorney General
5  ROSE B. FUA
   TIMOTHY E. SULLIVAN, State Bar No. 197054
6  Deputy Attorneys General
    1515 Clay Street, 20th Floor
7   P.O. Box 70550
    Oakland, CA  94612-0550
8   Telephone:  (510) 622-4038
    Fax:  (510) 622-2270
9   Email:  Timothy.Sullivan@doj.ca.gov
   Attorneys for Plaintiff California Department of Toxic
10 Substances Control

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE EASTERN DISTRICT OF CALIFORNIA

14

15 | **CALIFORNIA DEPARTMENT OF TOXIC**       Civ.S-02-0442 LKK DAD
16 | **SUBSTANCES CONTROL,**
                                             **SETTLEMENT AGREEMENT**
17 |                              Plaintiff,  **AND CONSENT DECREE**
                                             **BETWEEN DTSC AND**
18 |         **v.**                           **CALIFORNIA WATER**
                                             **SERVICE COMPANY**
19 | **CITY OF CHICO, CALIFORNIA, et al.,**

20 |                             Defendants.

21

22                       **INTRODUCTION**

23        Plaintiff, the California Department of Toxic Substances Control ("DTSC"), filed an

24 amended complaint on December 3, 2002, (the "Complaint") in the United States District Court

25 for the Eastern District of California (the "Court"), pursuant to the Comprehensive

26 Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et

27 seq., and California state law governing release of hazardous substances and nuisance.

28        The Court, on the motion and with the consent of DTSC and California Water Service

---

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

1 | Company, Inc. ("Cal Water"), hereby ORDERS, ADJUDGES, AND DECREES as follows:

2 | **1.    DEFINITIONS**

3 |         A.    All terms used in this Consent Decree that are defined in section 101 of CERCLA,

4 | 42 U.S.C. § 9601, shall have the same meaning set forth in that section.

5 |         B.    "DTSC," as used in this Consent Decree, shall mean DTSC, its predecessors

6 | including, but not limited to, the Toxic Substances Control Program of the State of California

7 | Department of Health Services, and its successors.

8 |         C.    "Chico Central Plume" means both the soil and groundwater existing in the

9 | shallow, intermediate, and/or lower aquifers underlying the city of Chico north of Big Chico

10 | Creek that are contaminated with perchloroethylene (including its breakdown products), the area

11 | of which is roughly represented by Figure 2-1 of the "Draft Remedial Action Plan, Chico Central

12 | Plume, Chico, California" dated March 1, 2006 (attached hereto as Exhibit A and incorporated

13 | herein by this reference), and all locations where such contaminants may come to be located.

14 |         D.    "Response Costs," as used in this Consent Decree, shall include all costs of any

15 | type or character whatsoever, including but not limited to costs related to "removal," "remedial

16 | action," or "response" (as those terms are defined by section 101 of CERCLA), incurred or to be

17 | incurred by DTSC in response to the release or threatened release of hazardous substances at, in,

18 | or from the Chico Central Plume.  Said term shall include, but not be limited to, direct labor

19 | costs; contractor, consultant and expert costs; travel and any other out-of-pocket expenses; the

20 | costs of identifying, developing evidence against, and pursuing claims against persons or entities

21 | liable for the release or threatened release of hazardous substances at, in, or from the Chico

22 | Central Plume; indirect costs; oversight costs; applicable interest charges; and attorneys' fees.

23 |         E.    "Remedial Action Plan," as used in this Consent Decree, shall mean a remedial

24 | action plan prepared to address the release or threatened release of hazardous substances at, in, or

25 | from the Chico Central Plume and finally approved by DTSC as described in California Health

26 | and Safety Code section 25356.1, and also includes any amendments to the remedial action plan

27 | that are subsequently approved by DTSC.

28 |

1      F.    "Proposed Remedy" means a remedial action to address contamination at, in, or

2  from the Chico Central Plume composed of the following measures, as set forth in more detail as

3  "Modified Alternative G" in the Draft Remedial Action Plan dated March 1, 2006: (1) The

4  pumping and treatment of water from six wells: three existing wells, known as CMW-101B, CMW-

5  117B, and CWS-21; either existing well CEW-1 or a new well similar in size and location to CEW-

6  1; and two new wells to be installed, known as CMW-118B and CMW-119B; (2) Pumping of

7  water from CWS-8 and, if necessary, treatment; (3) Seasonal pumping of well 45 at the Chico

8  High School; (4) Improvements and modifications to, and continued operation of, the granular

9  activated carbon filtration unit located at the Chico Cemetery (sometimes known as the "Interim

10  Remedial Measure"); (5) Periodic monitoring of groundwater from numerous groundwater

11  monitoring wells previously installed and installation of a new down-gradient monitoring well; and

12  (6) Continuation of the above activities for a period of at least 30 years or until contaminants of

13  concern are no longer detected.

14      G.    "Remedial Extraction Wells" means the five wells known as CMW-101B, CMW-

15  117B, CEW-1, CMW-118B, and CMW-119B, or any wells constructed to replace those wells.

16      H.    "Treatment System" means the granular activated carbon filtration unit referred to

17  in the Proposed Remedy intended to remove perchloroethylene from the Remedial Extraction

18  Wells, or any future treatment device that replaces the unit and serves the same purpose in the

19  Remedial Action Plan.  This term does not include treatment devices used to remove

20  contamination from other wells such as CWS-21 and CWS-8.

21  **2.    RECITALS**

22      A.    DTSC is the California state agency with primary jurisdiction over the response to

23  the release and threatened release of hazardous substances at, in, or from the Chico Central

24  Plume.

25      B.    DTSC seeks to recover from all defendants named in the Complaint, including but

26  not limited to Cal Water, jointly and severally, all costs it has incurred in response to releases

27  and/or threatened releases of hazardous substances at, in, or from the Chico Central Plume,

28  pursuant to section 107(a) of CERCLA.  DTSC also seeks a declaratory judgment that all such

1 | defendants are jointly and severally liable for all additional costs incurred by DTSC in response

2 | to the releases and/or threatened releases of hazardous substances at, in, or from the Chico

3 | Central Plume pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2). DTSC

4 | alleges that it will continue to incur Response Costs until the remedy selected in the Remedial

5 | Action Plan, and operation and maintenance of that remedy, is completed. DTSC also seeks

6 | injunctive relief to abate a public nuisance (California Health and Safety Code § 58009) and to

7 | abate an imminent or substantial endangerment to public health and safety or to the environment

8 | (California Health and Safety Code § 25358.3). DTSC also seeks to enforce administrative

9 | orders issued to various defendants, not including Cal Water, for investigation and remediation

10 | of the Chico Central Plume (California Health and Safety Code § 25358.3) and seeks damages

11 | suffered by DTSC as a result of the failure of certain defendants, not including Cal Water, to

12 | properly undertake a removal or remedial action (California Health and Safety Code § 25359).

13 |       C.      By entering into this Consent Decree, Cal Water expressly denies any liability

14 | whatsoever for any of the claims made in the Complaint and under any of the authorities stated in

15 | the Complaint, and makes no admission of liability. DTSC has not contended in this lawsuit that

16 | Cal Water was responsible for initially introducing any amount of perchloroethylene or any other

17 | contaminant into the groundwater or soils in the Chico Central Plume. DTSC acknowledges that

18 | Cal Water first identified the perchloroethylene problem in the Chico Central Plume pursuant to

19 | monitoring required under AB 1803 (ch. 881, Stats. 1983), cooperated with authorities in

20 | investigating the problem, and took steps to assist in remediating the perchloroethylene

21 | contamination, including taking treated water into its distribution system, allowing others to use

22 | its property for staging investigations, and assisting in the operation of DTSC's Interim

23 | Remediation Measure extraction and treatment system.

24 |       D.      Each of the parties to this Consent Decree represents and acknowledges that, in

25 | deciding whether to enter into this Consent Decree, it has not relied on any statement of fact,

26 | statement of opinion, or representation, express or implied, made by any other party to this

27 | Consent Decree. Each of the parties to this Consent Decree has investigated the subject matter of

28 | this Consent Decree to the extent necessary to make a rational and informed decision to execute

Settlement Agreement & Consent Decree                        Case No. CIV. S-02-0442 LKK DAD

4

1    it, and has had the opportunity to consult independent counsel.

2         E.    DTSC and Cal Water agree that settlement without further litigation and without

3    the admission or adjudication of any issue of fact or law is the most appropriate means of

4    resolving this action. This Consent Decree was negotiated and executed by DTSC and Cal Water

5    in good faith to avoid prolonged and complicated litigation. DTSC and Cal Water, moreover,

6    have negotiated and executed this Consent Decree to further the public interest and to protect

7    human health and the environment.

8    **3.    JURISDICTION**

9         This Court has jurisdiction over DTSC's federal law claims, which arise under CERCLA,

10   pursuant to 28 U.S.C. section 1331 and 42 U.S.C. section 9613(b). This Court has jurisdiction

11   over DTSC's state law claims under the supplemental jurisdiction provision of 28 U.S.C. section

12   1367(a) and under 28 U.S.C. section 2201, in that the state and federal claims arise from

13   common facts relating to release of hazardous substances and remediation of or failure to

14   remediate the resulting contamination. This Court has personal jurisdiction over each of the

15   parties to this Consent Decree. Venue is proper in the Eastern District of California pursuant to

16   28 U.S.C. section 1391(b) and 42 U.S.C. section 9613(b). This Court, further, has the authority

17   to enter this Consent Decree as a consent decree of the Court.

18   **4.    SETTLEMENT OF DISPUTED CLAIMS**

19        4.1    This Consent Decree represents a fair, reasonable, and equitable settlement of the

20   matters addressed herein.

21        4.2    For the purposes of this Consent Decree, Cal Water admits none of the allegations

22   of the Complaint. Nothing in this Consent Decree shall be construed as an admission of any

23   issue of law or fact or of any violation of law. Notwithstanding the foregoing, Cal Water

24   acknowledges that it has agreed to perform certain acts and further acknowledges its

25   responsibility pursuant to this Consent Decree to perform those acts it has agreed to undertake in

26   this Consent Decree, and shall not deny such responsibility in any proceeding brought by DTSC

27   to enforce this Consent Decree.

28        4.3    Except as set forth in section 9 of this Consent Decree, nothing in this Consent

Settlement Agreement & Consent Decree                              Case No. CIV. S-02-0442 LKK DAD

1    Decree shall prejudice, waive, or impair any right, remedy or defense that Cal Water may have in

2    any other or further legal proceeding.

3    **5.    WORK TO BE PERFORMED BY CAL WATER**

4         In exchange for the covenant not to sue contained in this Consent Decree, Cal Water agrees to

5    provide to DTSC the planning, engineering, design, construction, and equipment listed below in

6    sections 5.1, 5.2, 5.3, and 5.4, for the purposes of implementing a remedial action to address

7    releases of hazardous substances.

8         5.0    Recitals

9         5-A    Wells CMW-101B and CMW-117B are extraction wells located in the

10   Chico Central Plume. The water that is extracted from these wells is contaminated with

11   perchloroethylene. The extracted water is sent through a granular activated carbon treatment unit

12   to remove the perchloroethylene. Since 1995, DTSC has operated wells CMW-101B and CMW-

13   117B, and Cal Water has provided the treated water from these wells to its water customers in the

14   city of Chico pursuant to a permit issued by the Department of Health Services ("DHS"). Cal

15   Water currently owns and operates a well known as CWS-21, the water in which has been

16   contaminated with perchloroethylene. Cal Water treats the water from this well and provides it to

17   its water customers in the city of Chico pursuant to a permit issued by DHS. Cal Water currently

18   owns and operates a well known as CWS-8 that has shown some level of perchloroethylene

19   contamination, but at concentrations that are below the level at which treatment would be

20   required. Cal Water provides the water from this well to its water customers in the city of Chico

21   pursuant to a permit issued by the DHS.

22        5-B.    The Proposed Remedy for the Chico Central Plume includes the pumping and

23   treatment of water from six wells: three existing wells, known as CMW-101B, CMW-117B, and

24   CWS-21; either existing well CEW-1 or a new well similar in size and location to CEW-1 designed

25   and installed to take the place of CEW-1 in the Proposed Remedy; and two new wells to be

26   installed, known as CMW-118B and CMW-119B. A new down-gradient monitoring well is also

27   expected to be installed. Water will also be pumped from CWS-8 and treated if necessary.

28   Well 45 at the Chico High School is to be pumped seasonally. When construction of the

1    treatment system is completed, the five Remedial Extraction Wells will be connected to the

2    existing treatment system at the Chico Cemetery; well CWS-21 has its own separate treatment

3    unit; well CWS-8 will have its own separate treatment unit if necessary.  The location of wells

4    CMW-101B, CMW-117B, CEW-1, CWS-21, and CWS-8, and the proposed location of CMW-

5    118B and CMW-119B are shown on Exhibit B.

6        5-C.    As detailed below, Cal Water will retain contractors and design

7    professionals to design and install certain capital improvements included in the Proposed

8    Remedy.  Cal Water will provide for the construction of those specified capital improvements at

9    its expense but subject to a cost cap discussed elsewhere herein.  Any new extraction wells,

10   including CMW-118B and CMW-119B, as well as the new down-gradient monitoring well, are

11   excluded from the capital improvements to be designed and installed by Cal Water, except as

12   otherwise specified in section 5.1(a)(6).  Capital improvements related to site closure are also

13   excluded from the work to be performed by Cal Water.

14       5-D.    As detailed below, Cal Water will provide certain operation and

15   maintenance for the Proposed Remedy at its expense over a 30 year period, or until DTSC has

16   determined that the remediation is complete, whichever is earlier.  Cal Water will provide labor

17   and utilities at its own expense, but parts are excluded.  Cal Water will perform at its own

18   expense influent and effluent EPA standard 8260B or equivalent sampling and analysis once per

19   month, or similar sampling as need to meet DHS monitoring requirements, at each of the

20   Remedial Extraction Wells, the Treatment System, and wells CWS-21 and CWS-8.  Cal Water is

21   not required by this Consent Decree to perform any sampling or analysis of groundwater

22   monitoring wells, including, but not limited to, well purging, sample collection, analytical costs,

23   data analysis, hazardous waste disposal fees, or temporary storage.

24       5-E.    As of the signing of this Consent Decree, DTSC has not approved a final

25   Remedial Action Plan.  The amount, nature, and extent of work to be performed by Cal Water

26   pursuant to this Consent Decree shall not be expanded due to any differences between the

27   Proposed Remedy and the remedy ultimately selected in the approved Remedial Action Plan.

28       5-F.    DTSC installed the granular activated carbon filtration unit located at the

1 │ Chico Cemetery (sometimes known as the "Interim Remedial Measure"), which has been

2 │ operated in part by Cal Water for a number of years, initially pursuant to the terms of a written

3 │ agreement pertaining to the "Cemetery Wells," although that written agreement has now expired.

4 │ Except as specifically set forth in this Consent Decree, Cal Water shall hereafter have no

5 │ responsibility to operate said "Cemetery Wells" or "Interim Remedial Measure."

6 │     5.1.   Design and Construction of Remedial Measures.

7 │        (a)    Cal Water will hire design professionals and contractors, as necessary, to

8 │ complete the following elements of the Proposed Remedy (excluding design and construction of

9 │ CMW-118B, CMW-119B, and the new down-gradient monitoring well, except as otherwise

10 │ specified in section 5.1(a)(6)), to be defined in the Remedial Design, at its own expense but

11 │ subject to the Cost Cap described in section 5.1(b) below:

12 │       (1) Planning for new construction necessary to implement the Proposed

13 │ Remedy as follows:

14 │       (A)    Designing pipelines for transmission mains from the

15 │ Remedial Extraction Wells to the Treatment System and applicable station piping pursuant to the

16 │ following Cal Water specifications: Specifications for Material (attached hereto as Exhibit C),

17 │ Specifications for Disinfection of New Mains Based on the Procedures Outlined in the Latest

18 │ Revision of ANSI/AWWA C651 (attached hereto as Exhibit D), Specifications for the

19 │ Dechlorination of Flushed Water (attached hereto as Exhibit E), Specifications for Installation of

20 │ Ductile Iron and Polyvinyl Chloride (PVC) Pressure Pipe and Appurtenances (attached hereto as

21 │ Exhibit F).

22 │       (B)    Coordinating activities among parties conducting work;

23 │       (C)    Acquiring use permits, building permits, encroachment

24 │ permits for work in rights of way, electrical permits, and DHS permit amendments, including

25 │ preparation and submittal of applications for permits;

26 │       (D)    Negotiation of access rights or agreements, if necessary, as

27 │ an agent on behalf of DTSC when authorized in writing by DTSC to do so.  Consideration,

28 │ payments, costs or expenses, including attorney's fees, related to the acquisition of real property,

1    eminent domain, licenses, leases, easements, construction easements, rights of entry or access

2    rights shall not be borne by Cal Water.

3            (2)    Designing the Proposed Remedy as follows:

4               (A)    Preparing construction drawings for pipeline design;

5               (B)    Preparing the electrical design for the operation of pumps and

6    motor transporting water from the Remedial Extraction Wells to the Treatment System;

7               (C)    Preparing the concrete pad design to the requirements of the

8    City of Chico Building Department standards,

9               (D)    Preparing technical specifications for the pipelines, granular

10    activated carbon units, and all electrical components to operate the fixtures;

11               (E)    Selecting equipment for the pump and motors as well as

12    electrical equipment directly in connection with the operation of the mechanical equipment;

13               (F)    Preparation of bid packages, including a notice to bidders,

14    newspaper publication (if necessary), special conditions, drawings and/or specifications, a non-

15    collusion affidavit form, bid and/or performance bond forms and the terms and conditions for

16    construction agreements, which shall be exclusively determined by Cal Water;

17            (3)    Procuring and installing underground conveyance pipelines

18    between the Treatment System and each of the Remedial Extraction Wells (other than wells

19    CMW-110B and CMW-117B, which already are piped to the Treatment System), including all

20    labor and materials.

21            (4)    Providing traffic controls during all phases of construction of

22    pipelines and connections to the Treatment System necessary to implement the Proposed

23    Remedy.

24            (5)    Supplying personnel to supervise and coordinate all phases of

25    construction of pipelines and connections to the Treatment System as specified in the Remedial

26    Design.

27            (6)    Designing and installing controls for each of the Remedial

28    Extraction Wells so that the wells will shut down when the pressure exceeds Cal Water's normal

1  operating high-pressure limit in the water distribution system and restart when the pressure is

2  below a minimum water system pressure setting.  Cal Water will adjust these pressure settings to

3  give each of the Remedial Extraction Wells the pumping priority that has been assigned to that

4  well pursuant to the procedure in section 5.2(b).

5           (A)    DTSC shall provide, at no cost to Cal Water, control

6  equipment for each of the Remedial Extraction Wells so that the wells will shut down when the

7  pressure exceeds Cal Water's normal operating high-pressure limit in the water distribution

8  system and restart when the pressure is below a minimum water system pressure setting.

9        (b)   Cost Cap

10          (1)    If Cal Water spends more than $1,000,000 (one million dollars) to

11  undertake the actions listed in section 5.1(a), and DTSC determines that additional actions listed

12  in section 5.1(a) are necessary to the success of the Proposed Remedy, DTSC and Cal Water will

13  share the additional expenses equally until the total cost of actions listed in section 5.1(a) reaches

14  $1,500,000, after which time Cal Water will not be responsible for paying for additional actions

15  listed in section 5.1(a).

16          (2)    The $1,000,000 amount described in section 5.1(b)(1) includes the

17  following:  Cal Water's actual expenses for the capital improvements described in Section 5.1(a)

18  plus ten percent (10%) overhead on those capital improvements that are direct, non-contract costs

19  to Cal Water; actual expenses for other materials necessary to implement the actions listed in

20  Section 5.1(a); direct labor costs for time spent undertaking the actions listed in Section 5.1(a);

21  and payments to contractors to implement the actions listed in Section 5.1(a).  The Cost Cap

22  described in this section 5.1(b) applies only to the activities listed in section 5.1(a), and not to

23  other work required of Cal Water by this consent decree.

24          (3)    Until the actions listed in Section 5.1(a) have been completed, Cal

25  Water shall provide monthly statements to DTSC tracking the costs incurred to date for the labor

26  and capital improvements subject to the cap.

27          (4)    Cal Water shall maintain accurate books and records such that the

28  costs incurred by Cal Water in undertaking the actions listed in Section 5.1(a) can be ascertained.

1  Such books and records shall be maintained at the General Office of Cal Water and shall be

2  available for inspection and copying by DTSC during the normal business day upon ten (10)

3  working days written notice, except as to the year end close.  Copying shall be at expense of

4  DTSC.

5             (5)    For up to one year after the actions listed in Section 5.1(a) have

6  been completed, DTSC shall have the right at its own expense to have Cal Water's books and

7  records audited by an independent accounting firm or representative, and Cal Water agrees to

8  cooperate fully with DTSC in any such audit.  DTSC shall provide Cal Water forty-five (45)

9  calendar days advance notice of an audit and shall not request an audit during the year end close.

10  DTSC shall also have the right to access records submitted by Cal Water to the California Public

11  Utilities Commission ("CPUC") in connection with its reasonableness review of the costs for the

12  subject capital improvements in the applicable general rate case for the Chico District.

13             (c)    Cal Water, in its discretion, shall initially determine if actions to be

14  undertaken pursuant to Section 5.1(a) are to be bid competitively, sole source, or otherwise, or

15  are to be performed by Cal Water employees, subject to DTSC's right to review potential

16  contract awards, described below.  Cal Water is not subject to any public works bidding or

17  contract laws by virtue of this Consent Decree.

18             (1)    Cal Water shall review any bids and make recommendations to

19  DTSC for the award of contracts to perform the work specified in Section 5.1(a).

20             (2)    If, after completion of the design phase of the work to be

21  undertaken pursuant to Section 5.1(a), Cal Water receives any costs estimates for the remaining

22  actions required by Section 5.1(a), Cal Water will inform DTSC of the dollar amount of such

23  estimates.

24             (3)    DTSC is entitled to reject a contract award recommended by Cal

25  Water if performance of that contract would cause the cost of any of the actions to be undertaken

26  pursuant to Section 5.1(a) by Cal Water to be greater than the cost of the corresponding items

27  listed in Table 8-1 of the "Draft Remedial Action Plan, Chico Central Plume, Chico, California"

28  dated March 1, 2006 (attached hereto as Exhibit G).

1              (A)    In the event that DTSC rejects a contract award

2    recommendation, DTSC and Cal Water shall meet and confer to determine whether the work

3    proposed in the contract should be solicited again or performed in some other manner.

4              (B)    DTSC's approval of a contract award shall not be

5    unreasonably withheld.  DTSC shall have ten (10) calendar days from receipt to approve or deny

6    a Cal Water contract award recommendation.  DTSC shall consult with Cal Water prior to the

7    denial of any contract award.  Unless DTSC does not approve or otherwise denies a Cal Water

8    contract award recommendation within ten (10) calendar days from receipt of Cal Water's

9    recommendation, Cal Water will deem its contract award recommendation approved and proceed

10   with awarding the contract.

11             (d)    If the level of perchloroethylene in CWS-8 exceeds the Maximum

12   Contaminant Level (currently 5 parts per billion), Cal Water shall construct treatment at CWS-8

13   for 900 gallons per minute (GPM) including the installation of two single-bed 20,000-pound

14   granular activated carbon units meeting Cal Water's standards, or amendments thereto, for the

15   treatment of volatile organic compounds (including perchloroethylene) (attached hereto as

16   Exhibit H).  The proposed plant includes the construction of new electrical equipment, concrete

17   foundations, mechanical pumping equipment, site piping, and the initial fill of carbon filter

18   media meeting Cal Water's carbon specifications, or amendments thereto (attached hereto as

19   Exhibit H).

20             (e)    Cal Water shall not have title to nor ownership interest in the five wells

21   known as CMW-101B, CMW-117B, CEW-1, CMW-118B, CMW-119B, the new down-gradient

22   monitoring well, nor any wells constructed to replace these wells.  Cal Water shall have title to

23   and ownership of the capital improvements installed at its expense and shall retain ownership of

24   CWS-8 and CWS-21.

25             (f)    Except as to CWS-8, CWS-21, Cal Water shall not be responsible for the

26   payment of real property taxes or pump taxes for the Treatment System.  Except as to CWS-8,

27   CWS-21 and the capital improvements constructed by Cal Water at its expense, Cal Water shall

28   not be required to maintain insurance for the Treatment System.

1    (g)    DTSC will give Cal Water the opportunity to review any bids received by

2    DTSC for the construction of any of the Remedial Extraction Wells. Cal Water will consult

3    with DTSC on design of Remedial Extraction Wells and any equipment needed to be installed

4    on the Treatment System.

5    5.2    Acceptance of Treated Water from the Treatment System.

6    (a)    Cal Water will accept into its distribution system and deliver to its

7    customers the water treated by the Treatment System at its expense for 30 years from the date

8    that this Consent Decree is approved by the Court or for as long as DTSC determines that the

9    Treatment System should continue to operate, whichever is shorter. The quantity of water

10    anticipated but not guaranteed to be produced by the Treatment System is 750-1,000 gallons per

11    minute, depending upon system conditions and maintenance. However, Cal Water shall be

12    relieved of this requirement for any period of time during which a regulatory agency of the State

13    or federal government does not permit Cal Water to provide the treated pumped water (alone or

14    blended with other water) to its domestic water customers, provided that such prohibition is not

15    a result of Cal Water's failure, without substantial justification, to comply with a permit issued

16    to it.

17    (b)    Cal Water will use its best efforts to continuously (24 hours per day)

18    pump the Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary, as per section

19    5.4(a)(1)) at the rates specified in the Remedial Action Plan. Cal Water will manage its

20    pumping and distribution of water in order to give priority to continuous pumping of the

21    Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary) over all other Cal Water wells

22    in Chico such that Cal Water will stop pumping other Cal Water wells in Chico so that the

23    specified wells can continue to pump without exceeding the pressure limits of the distribution

24    system. These pumping requirements are subject to the following:

25    (1)    Cal Water will be allowed to shut down wells in case of

26    emergency or when necessary to perform routine maintenance, inspections, and repairs.

27    (2)    Cal Water may pump any Cal Water wells in Chico in

28    contravention of the priority established in section 5.2(b) if such pumping is needed to maintain

Settlement Agreement & Consent Decree                     Case No. CIV. S-02-0442 LKK DAD

1   system pressure to meet customer demand or regulatory requirements.

2                    (3)    Cal Water may pump wells CWS-16 and CWS-46 in

3   contravention of the priority established in section 5.2(b).

4                    (4)    No more than once per year, DTSC will inform Cal Water in

5   writing of the pumping priority among each of the Remedial Extraction Wells, CWS-21, and

6   CWS-8 (if necessary).  If at any time water distribution system pressure limits do not allow the

7   Remedial Extraction Wells, CWS-21, and CWS-8 (if necessary) to all be pumped

8   simultaneously, Cal Water may stop pumping one or more of these wells in the priority order

9   specified by DTSC until such time as system pressure allows one or more of these wells to

10  resume pumping.

11                   (c)    DTSC, at its expense, shall equip each of the Remedial Extraction Wells

12  with a chart recorder that will record flow rate and water system pressure.  DTSC, at its expense,

13  shall equip the Remedial Extraction Wells with a totalizing flow meter.  Cal Water shall report

14  to DTSC each month the monthly total output of each of the Remedial Extraction Wells, CWS-

15  21, and CWS-8.

16                   (d)    Under no circumstances is Cal Water required to manage the treated

17  water at its expense in a manner other than by delivering water to its customers.

18                   (e)    Cal Water is not required to pay any user fees for the acceptance of the

19  treated water from the Remedial Extraction Wells during the time that it is providing at its own

20  expense the services described in section 5.3.

21                   (f)    Cal Water shall use its best efforts to obtain from DHS or any other

22  applicable regulatory agency a permit allowing it to deliver the treated water from the Treatment

23  System to its customers.  These efforts shall include collecting and providing necessary data,

24  preparing application documents, supplying maps and diagrams, responding to inquiries from

25  regulators, and implementing at its expense the 12-step process set forth in the DHS letter of

26  February 17, 2006, to Cal Water.  (The letter and DHS's "Policy Memo 97-005 Policy Guidance

27  for Direct Domestic Use of Extremely Impaired Sources" are attached hereto as Exhibit I.)  Cal

28  Water shall not be responsible for the costs, including attorney's fees and engineering or

Settlement Agreement & Consent Decree                              Case No. CIV. S-02-0442 LKK DAD

1    environmental consultant's fees, associated with the preparation and approval of an

2    environmental impact report (EIR), if required for the Treatment System and/or the Remedial

3    Extraction Wells.

4            (1)    Denial or revocation of a permit by DHS or any other applicable

5    regulatory agency that results in the inability of Cal Water to legally provide the treated water to

6    its domestic water customers shall not constitute a violation of this Consent Decree, unless the

7    denial or revocation is due to Cal Water's failure, without substantial justification, to comply

8    with the procedural requirements of or requests for information from the regulatory agency.  Cal

9    Water shall have a reasonable opportunity to cure said denial or revocation after written notice

10    thereof before it is deemed a violation of this Consent Decree.

11            (g)    Cal Water shall remain in compliance with all applicable statutes,

12    regulations, and permits, including permits issued by DHS, which allow it to deliver treated

13    water from the Treatment System to its domestic water customers.

14        5.3    <u>Ongoing Operations and Maintenance of the Treatment System.</u>

15        Starting on the day that this Consent Decree is entered as an order of the Court and

16    ending on the day 30 years subsequent thereto, or when DTSC has determined that the

17    remediation is complete, whichever is earlier, Cal Water will, at its expense, perform the work

18    specified below to operate and maintain the Treatment System, Remedial Extraction Wells, and

19    associated equipment and pipelines:

20            (a)    Pump the Remedial Extraction Wells as described in section 5.2.  Costs to

21    be borne by CWS are as follows:

22            (1)    Power used to pump the Remedial Extraction Wells and operate

23    the Treatment System;

24            (2)    Other utilities, such as telephone, necessary for the operation of the

25    Remedial Extraction Wells and Treatment System;

26            (b)    Cal Water shall maintain the Remedial Extraction Wells.  Maintenance

27    includes leak repair, adjustment and repair of pump lubrication equipment and flow meter

28    equipment, chart replacement, site inspection, and other maintenance necessary for operation of

Settlement Agreement & Consent Decree                 Case No. CIV. S-02-0442 LKK DAD

1    pumps, motors, and electrical equipment, as Cal Water determines is needed.

2                    (1)    Cal Water shall not be responsible for the cost of replacement

3    parts for the Remedial Extraction Wells, provided that the need to replace said parts is from

4    causes beyond the reasonable control of Cal Water, due to normal wear and tear, or end of

5    expected useful life.

6                    (2)    Cal Water shall not be responsible for the cost of disposing of raw

7    water from the Remedial Extraction Wells that cannot be conveyed to the Treatment System.

8            (c)    Cal Water shall perform maintenance of the Treatment System.

9    Maintenance includes leak repair, adjustment and repair of equipment, chart replacement, site

10    inspection, pre-filter replacement, coordination and supervision of replacement of carbon filter

11    media, and other maintenance necessary for operation of the Treatment System, as Cal Water

12    determines is needed.

13                    (1)    Cal Water shall not be responsible for the cost of replacement parts

14    for the Treatment System, provided that the need to replace said parts is from causes beyond the

15    reasonable control of Cal Water, due to normal wear and tear or end of expected useful life.

16                    (2)    Cal Water shall not be responsible for the cost of carbon filter

17    media used to treat water passing through the Treatment System, nor disposal of such media.  If

18    the selected treatment technology changes, Cal Water likewise shall not be responsible for costs

19    of replacements parts for the new technology.

20            (d)    Cal Water shall apply for and obtain any permits or permit amendments

21    or renewals necessary for the continued operation of the Treatment System and Remedial

22    Extraction Wells, including paying any permitting or regulatory fees necessary for the legal

23    operation of the Treatment System and Remedial Extraction Wells.  Cal Water shall not be

24    responsible for the costs, including attorney's fees and engineering or environmental

25    consultant's fees, associated with the preparation and approval of an environmental impact

26    report (EIR), if required for the Treatment System and/or the Remedial Extraction Wells.

27            (e)    Cal Water shall remain in compliance with all applicable statutes,

28    regulations, and permits, including permits issued by DHS, with respect to the work to be

1  performed pursuant to Section 5.3.

2       (f)    Cal Water will perform at its expense sampling and analysis, using method

3  EPA standard 8260B or equivalent, once per month, or similar sampling as need to meet DHS

4  monitoring requirements, of water extracted and treated as part of the Proposed Remedy, and

5  report those results to DTSC on a monthly basis.  Changes to the monitoring protocols may be

6  made with the prior written approval of DTSC.  The water to be sampled is as follows:

7            (1)    Water that has been treated by one of the granular activated carbon

8  units at the Treatment System prior to entry of that water into the second granular activated

9  carbon unit at the Treatment System;

10           (2)    Treated water that exits the Treatment System after passing

11  through both granular activated carbon units;

12           (3)    Raw, untreated water extracted from each of the five Remedial

13  Extraction Wells.

14       (g)    Cal Water is not responsible for the cost of any sampling or analysis of

15  groundwater monitoring wells, including, but not limited to, well purging, sample collection,

16  analytical costs, data analysis, hazardous waste disposal fees, or temporary storage.

17       (h)    Cal Water shall make reasonable efforts to obtain access to the Remedial

18  Extraction Wells and Treatment System and associated equipment and pipelines necessary to

19  carry out the activities described in this section 5.3.  Consideration, payments, costs or expenses,

20  including attorney's fees, related to the acquisition of real property, eminent domain, licenses,

21  leases, easements, construction easements, rights of entry or access rights shall not be borne by

22  Cal Water.

23   5.4    Operation of Wells CWS-21 and CWS-8.

24       Cal Water shall operate at its expense CWS-21 and CWS-8 (if necessary) for 30 years or

25  until DTSC has determined that the clean-up performance goals specified in the Remedial Action

26  Plan have been achieved, whichever is earlier.

27       (a)    In operating the well(s) Cal Water will perform, at its expense, the

28  following activities:

1          (1)    Pump CWS-21 and CWS-8 (if necessary). Subject to the

2    limitations described in section 5.2(b), Cal Water shall pump well CWS-21 as near to

3    continuously as possible. Subject to the limitations described in section 5.2(b), Cal Water shall

4    pump CWS-8 at its historical rate and frequency, until such time as CWS-8 exceeds the

5    Maximum Contaminant Level for perchloroethylene, after which time it will be pumped as near

6    to continuously as possible, provided that water from CWS-8 may be legally accepted into Cal

7    Water's distribution system.

8          (2)    Accept into its distribution system and deliver to its customers the

9    pumped water at its expense. Cal Water shall be relieved of this requirement for any period of

10   time during which a regulatory agency of the State or federal government prohibits CWS from

11   providing the pumped water to its domestic water customers, provided that such prohibition is not a

12   result of Cal Water's failure, without substantial justification, to comply with a permit issued to it

13   or failure to use available cost-effective technology to remove contaminants from the water

14   pumped by the well(s).

15         (3)    Monitor water extracted from wells CWS-21 and CWS-8 (if

16   necessary) by collecting influent and effluent samples each month, analyzing them for volatile

17   organic compounds, and reporting the results of such analyses to DTSC monthly. Changes to the

18   monitoring protocols may be made with the prior written approval of DTSC.

19         (4)    Apply for and obtain any permits, permit amendments or renewals

20   necessary for the continued operation of wells CWS-21 and CWS-8, including paying any

21   permitting or regulatory fees necessary for the legal operation of these wells, and remain in

22   compliance with all applicable regulations and permits, including permits issued by DHS, with

23   respect to the work to be performed pursuant to this Section 5.4.

24         (A)    Denial or revocation of a permit by DHS or any other

25   applicable regulatory agency that results in the inability of Cal Water to legally provide the

26   treated water from CWS-21 or CWS-8 to its domestic water customers shall constitute a

27   violation of this Consent Decree, if and only if the denial or revocation is due to Cal Water's

28   failure, without substantial justification, to comply with the procedural requirements of or

1   requests for information from the regulatory agency. Cal Water shall have a reasonable

2   opportunity to cure said denial or revocation after written notice thereof before it is deemed a

3   violation of this Consent Decree.

4                    (5)    Perform maintenance of wells CWS-21 and CWS-8 and associated

5   equipment and pipelines, including providing and installing replacement parts and replacing

6   carbon or other water treatment media.

7            (b)    If Cal Water determines that it is technically infeasible to operate either CWS-

8   21 or CWS-8 due to the physical condition of the well boring or casing or due to geological

9   conditions, the following procedures shall apply:

10                    (1)    Cal Water shall meet and confer with DTSC about the condition of

11   the well, potential remedies to correct the condition causing the technical infeasibility, and whether

12   operation of the well is needed to achieve the goals of the Remedial Action Plan.

13                    (2)    If DTSC determines that operation of the well is still needed to

14   achieve the goals of the Remedial Action Plan, then DTSC may choose one or more of the following

15   actions:

16                            (A)    Cal Water will rehabilitate the well at its own expense if

17   rehabilitation is technically reasonable.

18                            (B)    Cal Water will install a replacement well at its own expense to

19   take the place of the well to be taken out of service if the replacement well can be installed on the

20   same piece of property as the well to be taken out of service.

21                            (C)    Cal Water will install a replacement well at its own expense to

22   take the place of the well to be taken out of service on a parcel of land obtained by DTSC if the

23   replacement well cannot be installed on the same piece of property as the well to be taken out of

24   service.

25                    (3)    Cal Water is not obligated by this Consent Decree to acquire any real

26   property, by payment of consideration or through the exercise of eminent domain, for the purpose of

27   installing a well to replace CWS-21 or CWS-8. Cal Water is not obligated by this Consent Decree to

28   re-install a well more than one time nor to rehabilitate a well more than one time.

Settlement Agreement & Consent Decree                              Case No. CIV. S-02-0442 LKK DAD

1          (c)     If contaminants other than PCE are detected in CWS-8 or treatment

2 technology changes such that it is technically infeasible for Cal Water to operate CWS-8 solely with

3 the granular activated carbon adsorption described in section 5.1(d), the following procedures shall

4 apply: ·

5          (1)     Cal Water shall meet and confer with DTSC about the contaminant

6 levels in the well, potential treatment technologies, and whether operation of the well is needed to

7 achieve the goals of the Remedial Action Plan.

8          (2)     If DTSC determines that operation of the well is still needed to

9 achieve the goals of the Remedial Action Plan, then DTSC has the option of providing treatment

10 technology for the well, at no expense to Cal Water, such that the well can continue to operate legally.

11          (3)     Cal Water is not obligated by this Consent Decree to install treatment

12 technology on CWS-8 other than that described in section 5.1(d).

13         (d)     Cal Water shall operate any well installed to replace either CWS-21 or CWS-

14 8 according to terms of this Consent Decree applicable to the original well.

15         (e)     If for any reason CWS-21 or CWS-8 becomes permanently inoperable, Cal

16 Water shall immediately decommission the well pursuant to a work plan submitted to and approved

17 by DTSC.  Notwithstanding the foregoing, Cal Water may take CWS-8 and/or CWS-21 off-line

18 for repairs, rehabilitation, maintenance, peaking or due to system conditions described in section

19 5.2(b).

20         (f)     Other than as specified in this section 5.4, nothing in this Consent Decree

21 obligates DTSC to pay for or reimburse Cal Water for the activities listed in section 5.4.

22      5.5     Cal Water shall conduct all activities required by this Consent Decree in

23 compliance with all applicable state, local and federal requirements including, but not limited to,

24 requirements to obtain permits and to assure worker safety as set forth above.  Cal Water shall

25 also comply with all applicable or relevant and appropriate requirements of all Federal and state

26 environmental laws to be set forth in Remedial Action Plan.  The activities conducted by Cal

27 Water pursuant to this Consent Decree, if consistent with a Remedial Action Plan approved by

28

Settlement Agreement & Consent Decree                 Case No. CIV. S-02-0442 LKK DAD

1  DTSC, shall be considered to be consistent with California Health and Safety Code section

2  25356.1.5.

3       5.6     If the Remedial Action Plan states that activities being performed or to be

4  performed by Cal Water pursuant to any portions of section 5 are inconsistent with the selected

5  remedy for the Chico Central Plume, then Cal Water shall not be required by this Consent

6  Decree to perform those activities that the Remedial Action Plan explicitly identifies and states are

7  inconsistent with the remedy selected by the Remedial Action Plan.

8       5.7     The conveyance by Cal Water of any interest in property, including but not

9  limited to pipelines, pumping equipment, or treatment facilities, shall not release or otherwise

10  affect Cal Water's responsibilities to perform the work specified in section 5, except that:

11          (a)     If at any time Cal Water is no longer the public water purveyor for the

12  city of Chico, Cal Water may arrange with the successor water purveyor for the city of Chico,

13  or, subject to DTSC approval, with another entity of its choosing, to complete the obligations

14  of Cal Water to perform work under the terms of this Consent Decree; and

15          (b)     If, as a result of an exercise of eminent domain by a public entity, Cal

16  Water property necessary for complying with the terms of this Consent Decree, including but

17  not limited to pipelines, pumping equipment, or treatment facilities, is condemned and no

18  longer in Cal Water's possession, then Cal Water's responsibilities, if any, to perform the

19  work specified in section 5 will be based on applicable eminent domain law at the time of

20  condemnation.

21       5.8     Unless otherwise specified, nothing in this Consent Decree obligates DTSC to pay

22  for or reimburse Cal Water for any of the activities listed in section 5.  Nothing in this Consent

23  Decree prohibits or in any way limits Cal Water from seeking and obtaining reimbursement for

24  any of the activities listed in section 5, except from DTSC.

25       5.9     If requested by Cal Water with reasonable notice, DTSC will provide information

26  or testimony to the California Public Utilities Commission to explain the nature and necessity of

27  the work being performed by Cal Water pursuant to this Consent Decree.

28

Settlement Agreement & Consent Decree                                    Case No. CIV. S-02-0442 LKK DAD

1    5.10    Cal Water shall not be held liable or deemed to have breached this Consent

2    Decree for failure or delay caused by or resulting from causes beyond its reasonable control,

3    including, but not limited to, fire, floods or other extreme weather conditions, earthquakes, acts

4    of terrorism, acts of war, civil disturbances, acts of God, labor disturbances, embargoes, or delays

5    in acting by any governmental authority.

6                    (a)    Cal Water shall not be held responsible for removing such failures or

7    delays unless:

8                            (1)    The failures or delays result from causes within Cal Water's

9    control; or

10                           (2)    The failures or delays affect property owned by Cal Water, but only

11    to the extent the failures or delays affect such property.

12                   (b)    This paragraph is intended only to suspend and not discharge obligations

13    under this Consent Decree.  When the causes of the failure or delay are removed, performance

14    shall resume by Cal Water.

15    5.11    Within 10 days of the effective date of this Consent Decree, Cal Water and DTSC

16    shall each designate an individual to serve as a contact and liaison for the work described in

17    section 5.

18    **6.    GOVERNMENT LIABILITIES**

19                    Neither DTSC nor any other department or agency of the State of California shall be

20    liable for any injuries or damages to persons or property resulting from acts or omissions by Cal

21    Water in carrying out activities pursuant to this Consent Decree.  Neither DTSC nor any other

22    department or agency of the State of California shall be held as a party to any contract entered

23    into by Cal Water or its agents in carrying out activities pursuant to this Consent Decree unless

24    the contract is entered into in writing by DTSC or such other department or agency of the State of

25    California.

26    **7.    COVENANT NOT TO SUE BY DTSC**

27    7.1    Except as specifically provided in sections 7.2 and 8, below, and except as may be

28    necessary to enforce the terms of this Consent Decree, as of the date this Consent Decree is

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

1   entered as a consent decree of the Court, DTSC covenants not to sue Cal Water for "Matters

2   Addressed" by this Consent Decree. "Matters Addressed" includes any and all civil liability for

3   reimbursement of all or any portion of DTSC's Response Costs, past or future, declaratory relief,

4   injunctive relief or any other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous

5   Substance Account Act, California Health & Safety Code §§ 25300 et seq., or any other

6   applicable federal or state statutory or common law for liability for Response Costs and/or

7   response actions, with regard to releases or threatened releases of perchloroethylene (including its

8   breakdown products) at, in, or from the Chico Central Plume, as set forth in the Complaint.

9        7.2    "Matters Addressed" shall not include, and the covenant not to sue set forth in

10   section 7.1 above does not pertain to, any matters other than those expressly specified in section

11   7.1. DTSC reserves, and this Consent Decree is without prejudice to, all rights, claims and

12   causes of action DTSC may have against Cal Water with respect to all other matters, including

13   releases or threatened releases of hazardous substances in the city of Chico other than releases or

14   threatened releases of perchloroethylene (including its breakdown products) at, in, or from the

15   Chico Central Plume.

16        7.3    DTSC further covenants not to sue Cal Water for reimbursement of all or any

17   portion of DTSC's Response Costs, past or future, declaratory relief, injunctive relief or any

18   other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act,

19   California Health & Safety Code §§ 25300 et seq., or any other applicable federal or state

20   statutory or common law for liability for Response Costs and/or response actions with respect to

21   work being performed by Cal Water in compliance with this Consent Decree, including but not

22   limited to the pumping or not pumping of wells CWS-21 and/or CWS-8 (or other wells that

23   replace said wells) done in compliance with this Consent Decree.

24   **8.    RESERVATION OF RIGHTS**

25        8.1    The Covenant Not to Sue set forth in section 7.1 above does not pertain to the

26   following matters, which DTSC reserves, and this Consent Decree is without prejudice to all

27   rights and claims of DTSC against Cal Water with respect to the following:

28

Settlement Agreement & Consent Decree                          Case No. CIV. S-02-0442 LKK DAD

1          (a)    material failure of Cal Water to meet the requirements of this Consent

2   Decree;

3          (b)    damage to natural resources, as defined in Section 101(6) of CERCLA, 42

4   U.S.C. section 9601(6), including all costs incurred by any natural resources trustees; and

5          (c)    criminal liability.

6       8.2    Except as expressly provided in this Consent Decree, nothing in this Consent

7   Decree is intended nor shall it be construed to preclude DTSC from exercising its authority under

8   any law, statute or regulation.  Furthermore, nothing in this Consent Decree is intended, nor shall

9   it be construed, to preclude any other state agency, department, board or entity or any federal

10  entity from exercising its authority under any law, statute or regulation.

11  **9.    COVENANT NOT TO SUE BY CAL WATER**

12      9.1    Cal Water covenants not to sue, and agrees not to assert any claims or causes of

13  action against, DTSC, or its contractors or employees, for any costs or damages Cal Water might

14  incur or for any injuries or losses Cal Water might suffer as a result of its performance of the

15  requirements of this Consent Decree.

16      9.2    Cal Water further covenants not to sue, and agrees not to assert any claims or

17  causes of action (including those previously identified in any counterclaims filed by Cal Water)

18  under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California

19  Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or

20  common law, against, DTSC or its contractors or employees, arising from any costs Cal Water

21  has incurred, or may incur in the future, conducting removal or remedial activities, including

22  operation and maintenance activities, at and for the Chico Central Plume.

23      9.3    Nothing in this section 9 prohibits Cal Water from taking such action as is

24  necessary to enforce the provisions, terms, or conditions of this Consent Decree.

25  **10.   EFFECT OF CONSENT DECREE**

26      10.1   This Consent Decree constitutes the resolution of Cal Water's liability to DTSC

27  with respect to the Matters Addressed in a judicially approved settlement within the meaning of

28  section 113(f)(2) of CERCLA, 42 U.S.C. section 9613(f)(2).  This Consent Decree requires Cal

1    Water to perform various activities in connection with the remediation of the hazardous

2    substances released at, in, or from the Chico Central Plume.

3        10.2    Accordingly, upon entry of this Consent Decree as a consent decree of the Court,

4    and provided that Cal Water performs all of its obligations under this Consent Decree, Cal Water

5    shall be entitled, as of the date this Consent Decree is entered as a consent decree of the Court, to

6    protection against all claims for contribution, pursuant to section 113(f)(2) of CERCLA, 42

7    U.S.C. section 9613(f)(2), for the Matters Addressed by this Consent Decree (as described in

8    section 7), to the fullest extent permitted by law, and by entering this Consent Decree this Court

9    makes a determination pursuant to California Code of Civil Procedure section 877.6 that the

10   settlement was made in good faith and shall bar any other joint tortfeasor or co-obligor from any

11   further claims against the settling tortfeasor or co-obligor (Cal Water) for equitable comparative

12   contribution, or partial or comparative indemnity, based on comparative negligence or

13   comparative fault.

14       10.3    Except as specifically provided in this Consent Decree, nothing in this Consent

15   Decree is intended, nor shall be construed, to waive, release, or otherwise affect any right, claim,

16   or cause of action held by any party to this Consent Decree against, or to provide a covenant not

17   to sue to, any third person not a party to this Consent Decree, or to in any way limit, restrict, or

18   impair the right of any party to this Consent Decree to assert rights, claims, causes of actions, and

19   defenses against any third person not a party to this Consent Decree, including without limitation,

20   the right to seek payment, reimbursement, contribution, or indemnity from such persons for

21   obligations incurred or to be incurred, or actions taken or to be taken, under this Consent Decree.

22   Except as specifically provided in this Consent Decree, DTSC and Cal Water expressly reserve

23   any rights, claims, or causes of actions they might have against any third person not a party to

24   this Consent Decree.

25       10.4    This Consent Decree is contingent and dependent on all of its terms being

26   approved and ordered by the Court.  If the Court does not approve and order this Consent Decree,

27   DTSC and Cal Water reserve all of their respective rights, remedies, and defenses.

28       10.5    This Consent Decree is not intended, nor shall it be construed, to limit or

Settlement Agreement & Consent Decree                          Case No. CIV. S-02-0442 LKK DAD

1  otherwise affect DTSC's right to select a remedial action for the Chico Central Plume that is

2  different from or inconsistent with the Proposed Remedy.

3      10.6    By agreeing to the terms of this Consent Decree, including but not limited to the

4  statement of work to be performed by Cal Water, Cal Water does not warrant, promise, represent

5  or guarantee that any of the actions taken by Cal Water will remediate or have any effect upon

6  contamination in the Central Plume.

7      10.7    Nothing in this Consent Decree obligates DTSC to perform, implement, or pay for

8  any work specified in the Remedial Action Plan or included in the definition of the Proposed

9  Remedy, to clean up or remediate contaminated groundwater, or to provide treated or

10  uncontaminated water to Cal Water.  This Consent Decree does not create a cause of action

11  against DTSC for any failure by DTSC to perform, implement, or pay for any work specified in

12  the Remedial Action Plan or included in the definition of the Proposed Remedy, to clean up or

13  remediate contaminated groundwater, or to provide treated or uncontaminated water to Cal

14  Water.

15  **11.    RETENTION OF RECORDS**

16      11.1    Cal Water shall provide to DTSC, upon request, copies of all documents and

17  information within its possession or control or that of their contractors or agents relating to the

18  implementation of this Consent Decree, including, but not limited to design specifications,

19  reports of construction activities, contracts, invoices, sampling, analysis, chain of custody

20  records, manifests, trucking logs, receipts, reports, sample traffic routing, and correspondence.

21  Such records shall be preserved by Cal Water until 10 years after the entry of this Consent

22  Decree, or 10 years after creation of a record or document, whichever is later.

23      11.2    Cal Water may assert that certain documents, records, and other information

24  requested by DTSC under section 11.1 are privileged under the attorney-client privilege or any

25  other privilege recognized by law.  If Cal Water asserts such a privilege, it shall provide DTSC

26  with the following: (1) the title of the document, record, or information; (2) the date of the

27  document, record, or information; (3) the name and title of the author of the document, record, or

28  information; (4) the name and title of each addressee and recipient of the document, record, or

Settlement Agreement & Consent Decree                      Case No. CIV. S-02-0442 LKK DAD

1  information; (5) a description of the subject of the document, record, or information; and (6) the

2  privilege asserted by Cal Water.  However, no documents, records, or other information created

3  or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds

4  that they are privileged.  If a claim of privilege applies only to a portion of a document, the

5  document shall be provided to DTSC in redacted form to mask the privileged information only.

6  Cal Water shall retain all records and documents it claims to be privileged until DTSC has had a

7  reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in

8  Cal Water's favor.

9        11.3    DTSC shall retain records relating to the implementation of this Consent Decree

10  in accordance with the requirements of the State Records Management Act (California

11  Government Code, §§ 14740-14774) and related implementing regulations and policies.  DTSC

12  shall make such records available to Cal Water upon request in accordance with the terms of the

13  California Public Records Act (California Government Code, §§ 6250 et seq.).

14  **12.    NOTIFICATION**

15        12.1.    Notification to or communication between the parties to this Consent Decree as

16  required or provided for in this Consent Decree shall be addressed as follows (except that

17  monitoring data required to be sent to DTSC pursuant to section 5 shall be sent only to

18  Mr. Tjosvold):

19            As to DTSC:

20            James Tjosvold
            Chief, Northern California Central Cleanup Operations Branch
21            Department of Toxic Substances Control
            8800 Cal Center Drive
22            Sacramento, CA 95826-3200
            Attn: Donald Mandel, Project Manager for Chico Central Plume
23            facsimile: (916) 255-3696

24            Steve Koyasako, Esq.
            Office of Legal Counsel
25            Department of Toxic Substances Control
            1001 "I" Street
26            P.O. Box 806
            Sacramento, CA 95812
27            facsimile: (916) 323-5542

28

1    Timothy E. Sullivan, Esq.
Deputy Attorney General
2    California Department of Justice
1515 Clay Street, 20th Floor
3    P.O. Box 70550
Oakland, CA 94612-0550
4    facsimile: (510) 622-2270

5    As to Cal Water:

6    Lynne McGhee
Corporate Counsel
7    California Water Service Company, Inc.
1720 North First Street
8    San Jose, CA. 95112-4598
facsimile:

9    Patrick D. Riddle
Paul D. Sheldon
10    Law Offices of Patrick D. Riddle
1811 Grand Canal Blvd., Suite 2
11    Stockton, CA 95207
facsimile: (209) 367-6997

12

13    12.2.   Upon 10 days notice to the other party, a party to this Consent Decree may

14    substitute another person for an addressee named above to receive notifications or

15    communications as required or provided for in this Consent Decree.

16    **13.    MODIFICATION OF SETTLEMENT AGREEMENT AND CONSENT DECREE**

17    This Consent Decree may only be modified upon the written agreement of DTSC and Cal

18    Water and the approval of the Court, or upon order of the Court after noticed motion by a party to

19    this Consent Decree.

20    **14.    APPLICATION OF CONSENT DECREE**

21    This Consent Decree shall apply to and be binding upon DTSC, Cal Water, and each of

22    their respective successors and assigns.  The provisions of this Consent Decree shall inure to the

23    benefit of DTSC, Cal Water, and each of their respective successors and assigns.  The provisions

24    of this Consent Decree shall also inure to the benefit of the officers, directors, employees and

25    agents, attorneys, and affiliates of Cal Water, in their capacities as such, and to Cal Water's

26    parent and subsidiary companies, including but not limited to California Water Service Group.

27    **15.    AUTHORITY TO ENTER**

28    Each signatory to this Consent Decree certifies that he or she is fully authorized by the

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

1  party he or she represents to enter into this Consent Decree, to execute it on behalf of the party

2  represented, and legally to bind that party.

3  **16.    INTEGRATION**

4      This Consent Decree, including the exhibits and other materials incorporated herein by

5  reference, constitutes the entire agreement between DTSC and Cal Water and may not be

6  amended or supplemented except as provided for in this Consent Decree.

7  **17.    RETENTION OF JURISDICTION**

8      The Court shall retain jurisdiction of this matter for the purpose of enforcing the terms of

9  this Consent Decree.

10  **18.    EXECUTION OF DECREE**

11      This Consent Decree may be executed in two or more counterparts, each of which shall

12  be deemed an original, but all of which together shall constitute one and the same instrument.

13  **19.    INTERPRETATION**

14      California law governs the interpretation of this Consent Decree.  This Consent Decree

15  shall be deemed to have been drafted equally by all parties hereto.

16  **20.    DISPUTE RESOLUTION**

17      20.1    The dispute resolution process described in this section is limited to disputes

18  relating to the scope, nature, or duration of work to be performed by Cal Water or DTSC

19  pursuant to the Consent Decree.

20      20.2    DTSC and Cal Water agree that they will make good faith efforts to informally

21  resolve any disputes as to the scope, nature, or duration of work to be performed by Cal Water

22  pursuant to the Consent Decree.  Such efforts shall include written or oral communications

23  between employees of Cal Water and DTSC to discuss the nature of the dispute and means of

24  resolving the dispute.

25      20.3    If a dispute remains after informal attempts at resolution, DTSC or Cal Water may

26  request to the other party in writing that the parties employ a mediator to help resolve the dispute.

27  Mediation is not required by this Consent Decree and must be agreed upon by both parties.  The

28  role of the mediator will be solely to facilitate discussions and help the parties resolve the dispute

1   on terms agreeable to both parties. The mediator will not have the power to issue rulings on the

2   meaning of the Consent Decree nor to make decisions binding on the parties. DTSC and Cal

3   Water will share equally in the cost of the mediation, and each party shall pay its own fees and

4   costs. DTSC and Cal Water agree that the mediation described in this section shall be conducted

5   by Martin Quinn, or by such other person as both parties agree upon.

6        20.4    Any dispute not resolved through the dispute resolution process described in this

7   section may be raised to the U.S. District Court for the Eastern District of California for

8   resolution.

9        20.5    Notwithstanding the invocation of the dispute resolution procedures set forth in

10   this section, Cal Water shall continue to perform all of its obligations under this Consent Decree

11   that are not substantially in dispute or at issue.

12   **21.    ATTORNEYS FEES AND COSTS**

13        As to each other, each party to this Consent Decree shall bear its own costs, attorneys'

14   fees, expert witness fees, and all other costs of litigation. This paragraph shall have no effect on

15   the parties' right to recover these fees or costs from any other party.

16   **22.    APPROVALS OF PARTIES**

17        Plaintiff DTSC consents to this Consent Decree by its authorized representative as

18   follows:

19                                                  CALIFORNIA DEPARTMENT OF
                                                    TOXIC SUBSTANCES CONTROL

20   Dated: 10/23/06                                /s/

21
                                                    James Tjosvold
22                                                  Chief, Northern California-Central Cleanup
                                                      Operations Branch
23                                                  California Department of Toxic Substances Control

24   ///

25   ///

26   ///

27   ///

28   ///

1    Cal Water consents to this Consent Decree by its authorized representative as follows:

2                                    CALIFORNIA WATER SERVICE COMPANY,
                                     INC.
3

4    Dated: 11/3/06               By:    /s/

5                                     Its:
6

7    Dated: 11/3/06               By:    /s/

8                                     Its:
9

10   APPROVED AS TO FORM:

11

12   DATED: 10/23/06
                                     BILL LOCKYER, Attorney General
13                                     of the State of California
                                     THEODORA BERGER
                                     Senior Assistant Attorney General
14                                   ROSE B. FUA
                                     Deputy Attorney General
15

16                                     /s/
                                     TIMOTHY E. SULLIVAN
17                                   Deputy Attorney General
                                     Attorneys for Plaintiff
18                                   CALIFORNIA DEPARTMENT OF TOXIC
                                     SUBSTANCES CONTROL
19

20   DATED: 11/7/06
                                     LAW OFFICES OF PATRICK D. RIDDLE
21

22                                     /s/
                                     PAUL D. SHELDON
23                                   Attorneys for Defendant
                                     CALIFORNIA WATER SERVICE COMPANY
24

25   IT IS SO ORDERED, ADJUDGED AND DECREED:

26

27   Dated:    May 23, 2007.

28                                   LAWRENCE K. KARLTON
                                     SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

31

1  SettlementAgreement.wpd

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Settlement Agreement & Consent Decree                    Case No. CIV. S-02-0442 LKK DAD

# EXHIBIT C

# PINO & ASSOCIATES, LLP

**ATTORNEYS AT LAW**

Westchester Financial Center
50 Main Street
White Plains, New York 10606
Telephone (914) 946-0600
Facsimile (914) 946-0650
www.pinolaw.com

**OF COUNSEL**
John R. Altieri\*\*
Hackensack, New Jersey

Rudolph V. Pino, Jr.
Thomas F. Healy\*
Frank C. Randazzo
Richard T. Petrillo
John M. Socolow
Brian W. Colistra
Matthew D. Kennedy
Lori F. Graybow
Marc A. Rousseau\*
Brian P. Mitchell\*\*

Also Admitted to CT Bar \*
Also Admitted to NJ Bar \*\*

June 27, 2008

## *VIA FACSIMILE*

Gary J. Smith, Esq.
Beveridge & Diamond, PC
456 Montgomery Street ~ Suite 1800
San Francisco, CA 94104

Re:     Cal Water Services Company v. Dow Chemical et al.

Dear Mr. Smith:

I have been authorized to consent on behalf of Mondial Drycleaning Products, Inc., improperly named as Union Drycleaning Products U.S.A., without waiver of any challenge to personal jurisdiction or service of process, to the removal of this action from the Superior Court in and for the County of San Mateo (originally denominated Case No. CV 473093) to the United States District Court for the Northern District of California.

If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

*Richard T. Petrillo /ac*

Richard T. Petrillo

RTP:ac

238o30.1

# EXHIBIT D

# PINO & ASSOCIATES, LLP

**ATTORNEYS AT LAW**

Westchester Financial Center
50 Main Street
White Plains, New York 10606
Telephone (914) 946-0600
Facsimile (914) 946-0650
www.pinolaw.com

OF COUNSEL
John R. Altieri**
Hackensack, New Jersey

Rudolph V. Pino, Jr.
Thomas E. Healy*
Frank C. Randazzo
Richard T. Petrillo
John M. Socolow
Brian W. Colistra
Matthew D. Kennedy
Lori E. Graybow
Marc A. Rousseau*
Brian P. Mitchell**

Also Admitted to CT Bar *
Also Admitted to NJ Bar **

June 30, 2008

*VIA FACSIMILE*

Gary J. Smith, Esq.
Beveridge & Diamond, PC
456 Montgomery Street ~ Suite 1800
San Francisco, CA 94104

Re:     Cal Water Services Company v. Dow Chemical et al.

Dear Mr. Smith:

I have been authorized to consent on behalf of Firbimatic S.p.A., named herein as Firbimatic, without waiver of any challenge to personal jurisdiction or service of process, to the removal of this action from the Superior Court in and for the County of San Mateo (originally denominated Case No. CV 473093) to the United States District Court for the Northern District of California.

If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Richard T. Petrillo

RTP:ac

238629 1

EXHIBIT E

# PINO & ASSOCIATES, LLP

**ATTORNEYS AT LAW**

Westchester Financial Center
50 Main Street
White Plains, New York 10606
Telephone (914) 946-0600
Facsimile (914) 946-0650
www.pinolaw.com

OF COUNSEL
John R. Altieri**
Hackensack, New Jersey

Rudolph V. Pino, Jr.
Thomas E. Healy*
Frank C. Randazzo
Richard T. Petrillo
John M. Socolow
Brian W. Colistra
Matthew D. Kennedy
Lori F. Graybow
Marc A. Rousseau*
Brian P. Mitchell**

Also Admitted to CT Bar *
Also Admitted to NJ Bar **

June 30, 2008

*VIA FACSIMILE*

Gary J. Smith, Esq.
Beveridge & Diamond, PC
456 Montgomery Street – Suite 1800
San Francisco, CA 94104

Re:     Cal Water Services Company v. Dow Chemical et al.

Dear Mr. Smith:

I have been authorized to consent on behalf of Realstar S.r.l., improperly named as Realstar, Inc., individually and d/b/a Realstar U.S.A., without waiver of any challenge to personal jurisdiction or service of process, to the removal of this action from the Superior Court in and for the County of San Mateo (originally denominated Case No. CV 473093) to the United States District Court for the Northern District of California.

If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Richard T. Petrillo

Richard T. Petrillo

RTP:ac

238631.1

# EXHIBIT F



# ARCHERNORRIS
## A PROFESSIONAL LAW CORPORATION

2033 North Main Street, Suite 800
Walnut Creek, CA 94596-3759
925.930.6600
925.930.6620 (Fax)
www.archernorris.com

PROBAL G. YOUNG
pyoung@archernorris.com

July 1, 2008

**VIA FACSIMILE 415.262.4040**

Gary J. Smith
Beveridge & Diamond, P.C.
456 Montgomery Street, Suite 1800
San Francisco, California  94104-1251

Re:    California Water Service Co. v. The Dow Chemical Co., et a.
       San Mateo County Superior Court No. CIV473093

Dear Mr. Smith:

As we discussed and in the event of proper service in the above-referenced action, Defendant
Echco Sales Co. Inc., without waiving any challenges to personal jurisdiction or service of
process, consents to the removal of this action from the Superior Court to the United States
District Court for the Northern District of California. This consent, of course, does not constitute
an appearance of any kind, whether it be general or special.

Very truly yours,

ARCHER NORRIS

Probal G. Young

PGY/dlm

TXPGY/672019-1